**FILED**
**United States Court of Appeals**
**Tenth Circuit**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

**June 8, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

_____

JOHNNY KASH BRYANT,

    Petitioner - Appellant,

v.

JANET DOWLING,

    Respondent - Appellee.

No. 20-5100
(D.C. No. 4:17-CV-00468-CVE-JFJ)
(N.D. Okla.)

_____

### ORDER AND JUDGMENT[*]
_____

Kimberly Penix, Alderman Law Firm, Fort Collins, CO, for Petitioner - Appellant.

Joshua L. Lockett, Assistant Attorney General, Office of the Attorney General for the State of Oklahoma, Oklahoma City, OK, for Respondent - Appellee.

_____

Before **HARTZ**, **SEYMOUR**, and **BALDOCK**, Circuit Judges.

_____

Johnny Kash Bryant was convicted in Oklahoma state court of molesting the 6-year-old daughter of his former stepdaughter. *See* Okla. Stat. tit. 21 § 1123. After unsuccessfully pursuing a direct appeal and postconviction proceedings in state court, Mr. Bryant sought relief under 28 U.S.C. § 2254 in the United States District Court for the Northern District of Oklahoma. The district court denied relief but granted a

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

certificate of appealability (COA), *see* 28 U.S.C. § 2253(c)(1) (requiring COA to appeal denial of relief under § 2254), on several issues relating to his claims of prosecutorial misconduct—that the prosecutor knowingly put on perjured testimony by the victim and her mother and that the prosecutor improperly told the jury to convict him not only on the charge of molesting the victim but also because of his molestation of his former stepdaughter. Exercising jurisdiction under 28 U.S.C. §§ 1291 and 2253, we affirm the district court's denial of relief. The state court reasonably ruled that the prosecutor did not knowingly put on perjured testimony and that the prosecutor's statements did not deny Mr. Bryant a fair trial.

## I.      BACKGROUND

We summarize the incriminating testimony by the chief prosecution witnesses: LaVona Bryant (Mr. Bryant's ex-wife), her daughter (and Mr. Bryant's former stepdaughter) Maghan Yeoman, and the victim M.B. (Ms. Yeoman's daughter). Ms. Yeoman testified that on the evening of November 6, 2011, Mr. Bryant visited her home, where she was living with her boyfriend, Ms. Bryant, and Ms. Yeoman's four children in Tulsa, Oklahoma. When Ms. Yeoman arrived home from work she was not pleased to see him on the porch. She told Mr. Bryant not to enter the house. After the children finished dinner she got them ready for bed. Her 6-year-old daughter M.B. went to sleep on a queen-size fold-out couch, and Ms. Yeoman went to sleep herself. She got up about 4:30 or 5 a.m. and went to work between 6 and 6:30 a.m. While on her way out she saw in the darkness a lump on the fold-out couch and assumed it was her mother and M.B.

2

Ms. Bryant testified that about midnight or 1 a.m., she came in from the porch and went to sleep on the fold-out couch, with M.B. sleeping on a mattress next to the couch. When Ms. Bryant went to sleep, Mr. Bryant was still outside on the porch. Ms. Bryant awoke at 5:30 a.m. and saw Mr. Bryant on the floor next to the fold-out couch; but when she got up at 6 or 6:30 a.m., after Ms. Yeoman had left for work, she discovered Mr. Bryant sleeping on the couch next to M.B. Angry, she woke him up and told him to leave. After he left, she asked M.B. whether she felt well enough to go to school because she had recently been sick. M.B. responded, "I would have been feeling better i[f] Peepaw would have left me alone all night," and, "Peepaw was messing with me all night long." R., Vol. III at 320. M.B. said Mr. Bryant had been "rubbing on her tutu." *Id*. The police were called.

M.B. testified at trial that on the night in question Mr. Bryant came into the house about 8 p.m. and got on the fold-out couch next to her, with Ms. Bryant on the other side of her. Mr. Bryant repeatedly touched her until about 1 a.m. She said that Mr. Bryant had "pushed in on my toolly" with his hand over her underwear, and "[i]t kind of hurt." *Id*. at 230. (Using a diagram she had identified her "toolly" as her vagina.) At one point Mr. Bryant "pulled [M.B.] on top of him" and "moved his legs a little bit." *Id*. at 231–32. M.B. was unable to identify Mr. Bryant in the courtroom, but she gave the name of the person who touched her, said that person was her step-grandfather, and described him in a general sense (that he was a white man in his 40s or 50s who always wore a toolbelt).

3

Ms. Yeoman also testified about prior sexual assaults by Mr. Bryant. When she testified, she was 29 years old. But while she was 4 to 14 and then again at age 17, she was molested by Mr. Bryant when he lived in the same household as Ms. Yeoman and her mother. She recounted several specific instances of molestation. The abuse reached the point that in 1998, when Ms. Yeoman was 14 years old, she reported the abuse and Oklahoma's Department of Human Services (DHS) took custody of her.

The jury convicted Mr. Bryant of molesting M.B. and recommended a sentence of 99 years' imprisonment and a $10,000 fine. The judge accepted the recommended sentence. Mr. Bryant filed his § 2254 application in 2017. In an amended application he alleged among other things that the prosecutor committed misconduct by (1) knowingly presenting false testimony from M.B. and Ms. Yeoman and (2) making improper comments that caused the jury to convict him for uncharged conduct against Ms. Yeoman and impose an excessive sentence. In 2020 the federal district court denied relief, but granted a COA on three issues. Mr. Bryant appealed on those issues and seeks a COA on several other issues. After receiving his opening and reply briefs, we appointed counsel to represent him on appeal and file a supplemental brief.

## II.    DISCUSSION

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides that when a claim has been adjudicated on the merits in a state court, a federal court can grant habeas relief only if the applicant establishes that the state-court decision

4

was "contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States," or "was

based on an unreasonable determination of the facts in light of the evidence presented

in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). As we have explained:

> Under the "contrary to" clause, we grant relief only if the state court arrives
> at a conclusion opposite to that reached by the Supreme Court on a question
> of law or if the state court decides a case differently than the Court has on a
> set of materially indistinguishable facts.

*Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004) (brackets and internal

quotation marks omitted). Relief is provided under the "unreasonable application"

clause "only if the state court identifies the correct governing legal principle from the

Supreme Court's decisions but unreasonably applies that principle to the facts of the

prisoner's case." *Id*. (brackets and internal quotation marks omitted). Thus, a federal

court may not grant relief simply because it concludes in its independent judgment

that the relevant state-court decision applied clearly established federal law

erroneously or incorrectly. *See id*. Rather, "[i]n order for a state court's decision to be

an unreasonable application of [the Supreme] Court's case law, the ruling must be

objectively unreasonable, not merely wrong; even clear error will not suffice."

*Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017) (per curiam) (internal quotation

marks omitted). To prevail, "a litigant must show that the state court's ruling was so

lacking in justification that there was an error well understood and comprehended in

existing law beyond any possibility for fairminded disagreement." *Id*. (ellipsis and

internal quotation marks omitted). "AEDPA's deferential standard applies not only to

5

claims the state court squarely addressed, but also to claims it reached only cursorily." *Ryder ex rel. Ryder v. Warrior*, 810 F.3d 724, 740 (10th Cir. 2016). "When the state court does not explain its reasoning, the applicant must still show that there was no reasonable basis for the state court to deny relief." *Black v. Workman*, 682 F.3d 880, 892 (10th Cir. 2012) (internal quotation marks omitted).

Under AEDPA federal courts generally cannot grant relief unless the applicant has exhausted available remedies in state court. *See* 28 U.S.C. § 2254(b)(1). As Mr. Bryant concedes, he never raised standalone prosecutorial-misconduct claims in state court. If, however, the failure to exhaust was caused by ineffective assistance of defense counsel, then the prisoner may be able to pursue relief under § 2254. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986) ("Ineffective assistance of counsel . . . is cause for a procedural default."). To prevail on a claim of ineffective assistance, a defendant must show both that his counsel's performance was deficient—"that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"—and that "the deficient performance prejudiced [his] defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Therefore, the district court considered whether Mr. Bryant could overcome the failure-to-exhaust procedural bar on the ground that he had been prejudiced by ineffective assistance of counsel. In rejecting the § 2254 application the district court ruled that on each claim Mr. Bryant had either failed to overcome the procedural bar or failed to overcome AEDPA deference to the state courts' decisions.

Nevertheless, the district court granted Mr. Bryant a COA on three issues:

(1) whether the procedural default doctrine bars the prosecutorial-misconduct claim asserted in claim two of the amended petition, (2) if so, whether appellate counsel's failure to raise a prosecutorial-misconduct claim on direct appeal, as asserted in claim four of the amended petition, excuses the procedural default of that claim, and (3) if so, whether prosecutorial misconduct deprived petitioner of a fair trial, as asserted in claim two of the amended petition.

R., Vol. I at 774–75. We need not address the first two issues on which a COA was granted, because Mr. Bryant cannot prevail even if he can overcome any procedural default in state court.

We reach this conclusion largely because we must defer to rulings by the Oklahoma Court of Criminal Appeals (OCCA) in this case. This may seem odd because Mr. Bryant did not raise any standalone prosecutorial-misconduct claims in that court. The OCCA did, however, substantively address some of those claims in the course of disposing of the claims that *were* raised before the OCCA. On appeal from the denial of his first state postconviction application, Mr. Bryant argued to the OCCA that appellate counsel rendered ineffective assistance in omitting from direct appeal claims that the prosecutor (1) knowingly presented false testimony from Ms. Yeoman, (2) knowingly presented false testimony from M.B., and (3) made an improper comment in his opening statement about uncharged conduct against Ms. Yeoman. In response the OCCA held:

> Examining Bryant's claims of ineffective assistance of counsel, based on appellate counsel's failure to adequately raise these claims, and pursuant to this Court's decision in the *Logan* [*v. State*, 293 P.3d 969 (Okla. Crim. App. 2013)] and *Strickland* standards stated above, we find Bryant has failed to establish that appellate counsel's performance was deficient or objectively unreasonable and *has failed to establish any resulting prejudice*. To support his ineffective assistance of appellate counsel claim, Bryant

must show that appellate counsel would have prevailed on direct appeal had he argued trial counsel was deficient and that these enumerated errors resulted in prejudice. His claims as presented in this application for Post-Conviction relief do not support a finding that either trial or appellate counsel was ineffective. . . . Bryant's ineffective assistance of trial and appellate counsel claims are without merit.

R., Vol. II at 49–50 (emphasis added and citation omitted). By holding that Mr. Bryant had failed to show prejudice from the alleged ineffective assistance of counsel, the state court in effect ruled that the claims not brought by his counsel lacked merit. We defer to that ruling under AEDPA even though the state court addressed the merits of the prosecutorial-misconduct claims only in the course of resolving the prejudice prong of *Strickland*. *See Goode v. Carpenter*, 922 F.3d 1136, 1159–60 (10th Cir. 2019). AEDPA permits us to resolve this case on the merits despite any failure of Mr. Bryant to exhaust the issues in state court. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

### A.    False-testimony claims

Under *Napue v. Illinois*, 360 U.S. 264 (1959), a violation of the Due Process Clause "occurs when (1) a government witness committed perjury, (2) the prosecution knew the testimony to be false, and (3) the testimony was material." *United States v. Garcia*, 793 F.3d 1194, 1207 (10th Cir. 2015). Mr. Bryant asserts

8

that the testimony of M.B. and her mother, which was undoubtedly material, was perjured and the prosecution knew it.[1]

### 1.    Alleged perjury by Ms. Yeoman

Mr. Bryant contends that the prosecution knowingly introduced false testimony by Ms. Yeoman that she had been molested by him when she was a child. This contention is based on a DHS report from October of 1998, which, according to Mr. Bryant's supplemental brief on appeal, shows that Ms. Yeoman "recanted her allegations of abuse by Bryant in 1998." Aplt. Suppl. Br. at 10. Mr. Bryant argues that the prosecutor knew from the DHS report the falsity of Ms. Yeoman's testimony that he molested her when she was a child but presented her testimony anyway.

We reject the claim. We are unsure about the exact contents of the DHS report referenced by Mr. Bryant because it is not copied in the record. But the jury did hear about the contents through questioning by defense counsel. Defense counsel first raised it on cross-examination of Ms. Yeoman, asking, "Did you ever tell [a] DHS worker that . . . you told Johnny that you were sorry you made up the allegations?" R., Vol. III at 295–96. Ms. Yeoman said no. The source of whatever statement was

---

[1] As the factual support for these assertions, Mr. Bryant relies solely on evidence presented to the jury at trial. Thus, he would have the court determine that the prosecution knowingly put on perjured testimony when the jury obviously believed the testimony or believed that any falsity was immaterial to the result. We are not aware of any Supreme Court or Tenth Circuit precedent in which a *Napue* violation was supported solely by evidence presented to the jury. *See Long v. Pfister*, 874 F.3d 544, 549 (7th Cir. 2017) (en banc) (noting that Supreme Court has never answered the question: "Does the Constitution forbid a conviction obtained when all material evidence is presented to the jury before it deliberates?"). But we do not rest our decision on that feature of this case.

made turned out to be Ms. Bryant. Defense counsel asked her, "Do you recall telling a Mayes County DHS worker that your daughter, on October 14th of '98, that your daughter said she dropped the charges and told Johnny she was sorry she made the allegations?" *Id*. at 332. Ms. Bryant said she remembered. On redirect the prosecutor asked Ms. Bryant, "Is it your understanding that [Ms. Yeoman] was stating that the allegations were in fact false?" *Id*. at 335. Ms. Bryant answered no.

It is hardly unusual for family members to regret making criminal accusations against a relative. The testimony at trial was fully consistent with that having been the circumstance here. And the record does not compel the conclusion that Ms. Yeoman's testimony about her abuse was so obviously false that the prosecution must have known that. The OCCA, by holding that Mr. Bryant was not prejudiced by the failure of his counsel to raise his claims of prosecutorial misconduct (in other words, holding that the claims lack merit), did not unreasonably apply the prejudice prong of *Strickland* to this claim. Deferring to the OCCA's no-prejudice ruling, we deny relief on this claim. *See Goode*, 922 F.3d at 1159–60.

### 2.    Alleged perjury by M.B.

Mr. Bryant also contends that the prosecution knowingly introduced perjured testimony by the victim, M.B. His briefs in this court claim two sources of support for this contention. First, he points to M.B.'s pretrial statements allegedly establishing that her allegations against Mr. Bryant were coerced by her mother and grandmother. The statements were in the following exchange during M.B.'s forensic interview by a child specialist with the Oklahoma Child Abuse Network, an

10

organization that provides mental-health support and conducts forensic interviews in child-abuse cases (the record contains a video of the interview, and we have interlineated our observations of nonverbal material):

> INTERVIEWER: [M.B.], did anybody tell you what to say when we talked in here?
>
> [M.B. drops marker on the ground and fumbles around trying to find it.]
>
> INTERVIEWER: Who told you something to say?
>
> M.B.: Both of them.
>
> INTERVIEWER: Both of them? Okay. What did they say about what to say in here?
>
> M.B.: Well, it was about my grandpa touching me.
>
> INTERVIEWER: It was about your grandpa touching you?
>
> M.B.: Mmhmm.

State Ex. 3 at 00:27–00:28. Mr. Bryant interprets this exchange to mean that M.B. was told by her mother and grandmother to say (falsely) that he molested her. The government had another take on what happened, stating the following in rebuttal closing argument:

> I want you to watch M.B. and the timing of that question. Watch what M.B.'s doing. The marker that she had, and it falls on the ground, and M.B. is consumed. You can see her trying to find this marker. She gets up. She's going behind the easel as she's asking this question. She finally pops up she says, uh-huh, yeah, Grandma and Mom. What about? About him touching my toolly. Ask yourself was she answering the question what did someone tell . . . you [to] say? What did . . . someone tell you to fabricate? Or is she answering the question, do you know why you're here? Do you know why you're here to talk about something? But watch her. Sweet little girl. She's on the ground trying to find a marker. That's her concern at that moment in life.

11

R., Vol. III at 486–87. Another reasonable possibility is that the mother and

grandmother had simply told the child what the interview was going to be about. In

any event, this one exchange in the forensic interview hardly compels the conclusion

that M.B. was lying about her molestation by Mr. Bryant, much less that the

prosecution knew she was lying. Although no transcript can fully capture the nature

of testimony, we add in a footnote a portion of the transcript of the child's testimony

that suggests an artless personality, not likely to be intimidated by authority.[2]

---

[2] The following is from the direct examination of M.B.:

Q. The person you said is Johnny who used to be your grandpa—
A. Yes.
Q. —can you look around the courtroom for me—and if you need to you might need to stand up—can you look around the courtroom for me and tell me if you see Johnny? And if you do—and take your time—if you do, just tell me where he's sitting and what he's wearing?
A. I don't see Johnny.
Q. Okay. I want you to take just a little bit more time. Okay? Because I know it's kind of hard to see.
THE COURT: Excuse me. You can step down to where Mr. Horton is and just look around the room. Okay?
[PROSECUTOR]: You wanna kinda just step down here.
THE COURT: Might have to move Boo. And you just look around the room.
[PROSECUTOR]: You can come over with me. Judge, do you mind if I just bring her over here?
THE COURT: No. Just stand right up there.
Q. (BY [PROSECUTOR]) Okay. You can stand right here and just look around the courtroom see if you see him?
A. No.
Q. Okay. That's okay. Go ahead and have a seat. Let me ask you this: How long has it—oh, I'm sorry. Get you back in your seat. Let me ask you this: Have you seen Johnny since this happened?
A. No.
Q. Okay. And so it's been like we said a couple of years since this happened?

Mr. Bryant's position that he is not procedurally barred from raising this *Napue* claim (that is, the claim that the prosecutor knew that the child was lying because she was coerced by her mother and grandmother) is implicitly based on the proposition that the coercion issue was presented to the OCCA in his postconviction proceeding as part of the claim that appellate counsel was ineffective for not pursuing the *Napue* issue based on the alleged coercion of M.B. *See* Aplt. Br. at 6 ("In his state post conviction proceedings, Appella[nt] raised this claim of prosecution misconduct under ineffective assistance of appellate counsel."). For purposes of disposing of this issue, it is therefore fair for us to assume that the issue was presented to the OCCA. But the OCCA rejected the claims that Mr. Bryant's appellate counsel was ineffective—both because the representation was not deficient and because the failure to raise the claims did not prejudice him (since the claims had no merit). As previously explained, the holding on the lack-of-prejudice issue is entitled to AEDPA

---

A. Just two.
Q. Two. Okay. Do you remember the name Johnny Kash Bryant?
A. Yes.
Q. Okay. When I say Johnny Kash Bryant, is that the same Johnny Kash Bryant that you talked about today?
A. Yes.
Q. And he was your step grandfather for a little while?
A. Yes.
Q. Married to LaVona; correct?
A. Yes.
Q. Okay. Your grandmother.
A. He wasn't married. It's kinda hard to figure out.

R., Vol. III at 235–37. *Cf. id*. at 387 (forensic interviewer agreed with prosecutor that M.B. "had a fairly open personality").

deference when considering Mr. Bryant's *Napue* claim. *See Goode*, 922 F.3d at 1159–60. And Mr. Bryant cannot overcome that deference—the OCCA could reasonably determine that Mr. Bryant failed to show that the prosecution knew that the child's testimony was the product of coercion by her mother and grandmother.

Mr. Bryant also argues that M.B. was clearly lying (and the prosecution knew that) because one cannot reconcile her account with the timelines provided by her mother and grandmother in their pretrial statements to investigators, as well as their trial testimony. This timeline-based *Napue* argument, however, is not preserved for appellate review because Mr. Bryant failed to raise it in his amended § 2254 application.[3] *See Grant v. Royal*, 886 F.3d 874, 909 (10th Cir. 2018) (refusing to consider petitioner's arguments that were not raised in district court); *Owens v. Trammell*, 792 F.3d 1234, 1246 (10th Cir. 2015) ("Because the argument was not raised in his habeas petition, it is waived on appeal."); *Stouffer v. Trammell*, 738 F.3d 1205, 1222 n.13 (10th Cir. 2013) ("We do not generally consider issues that were not raised before the district court as part of the habeas petition."). We decline to address the argument.

---

[3] Nor could we say that it was implicitly raised in district court by incorporating arguments presented to the state court, because the argument was never raised there either until his procedurally barred second application for postconviction relief.

### B.      Improper-comment claim

The district court's grant of a COA also encompassed Mr. Bryant's claim that the prosecutor committed misconduct through a comment he made in his opening statement to the jury. We put the challenged (and improper) comment in context:

> At the end of this, you're going to be presented with their testimony and you're gonna have to ask yourself this: Why would M.B. say these things? Why would [Ms. Yeoman] say these things? Motive is not an element, but it's something you should probably consider. . . . And I submit to you when it's all said and done, you're gonna have this testimony, and it's gonna be enough. *It's gonna be enough for you to look over and convict this man of a minimum of 25 years for years of abuse towards [Ms. Yeoman] and towards M.B.*

R., Vol. III at 199 (emphasis added). As pointed out by Mr. Bryant, the emphasized statement "invited the jury to not only convict Bryant for alleged abuse of M.B. but also impose an excessive sentence based on the allegations of [Ms. Yeoman], for which Bryant was not on trial." Aplt. Suppl. Br. at 12. Mr. Bryant's briefs in this court also refer to comments made by the prosecutor in closing argument. The State argues waiver and nonexhaustion of any challenge to the closing argument. But since, as explained below, resolving the prosecutorial-misconduct issue requires considering relevant parts of the entire trial to determine whether Mr. Bryant received a fair trial, it is proper for us to consider the prosecutor's closing argument. In any event, even when we consider the comments at closing argument, Mr. Bryant's claim fails.

To establish a constitutional violation based on a prosecutor's improper comments, a petitioner "must show more than that the prosecutors' remarks were

15

undesirable or even universally condemned." *Black*, 682 F.3d at 907 (internal quotation marks omitted). "The issue is whether [petitioner] was denied his due-process right to a fair trial—that is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id*. (internal quotation marks omitted). "Making this determination requires viewing the challenged remarks in context." *Id*.; *see DeRosa v. Workman*, 679 F.3d 1196, 1222 (10th Cir. 2012) ("[T]he offending prosecutorial remark or action must be placed in the context of the whole trial, and not viewed in isolation.").

Was the potential prejudice arising from the prosecutor's opening statement mitigated by other events at trial? One could reasonably draw that conclusion. To begin with, the judge admonished the jury before Ms. Yeoman testified that her testimony about Mr. Bryant's past abuse was not to be taken "as proof of the guilt or innocence of the defendant of the specific offense charged in the Information" but instead as evidence "solely on the issue of the defendant's alleged motive, opportunity, intent, plan and identity." R., Vol. III at 264. And defense counsel reiterated this point at the outset of closing argument: "First of all, I want to make one thing clear. This is not a trial about Johnny Kash Bryant, Sr., allegations made by [Ms. Yeoman] in '98, '96. This is not the reason why we are here today." *Id*. at 469–70. Indeed, the prosecutor said essentially the same thing early in his rebuttal closing argument:

> I didn't call [Ms. Yeoman] to testify so that I can convict Johnny Kash Bryant, Sr. of what happened back in the '90s. I called her to testify so she could tell you how he lusts and sexually abuses children and he has going

back to the 1990s. Don't convict him for that, but when you're asking yourself is M.B. telling the truth, you can look at his intent. It's a jury instruction for you to read. . . . Not to convict him for what he did in the '90s, but see how it [a]ffects what you believe—whether you believe M.B. or not.

*Id*. at 484.

Unfortunately, the prosecutor seemed to stray from this proposition a few minutes later, saying: "Like I said, we agree the victim . . . in this case is M.B. And that she suffered. *And just like her mother, she will always be a victim.*" *Id*. at 490 (emphasis added). A defense objection to the comment was overruled. But not for long. When the prosecutor continued by saying, "And although they will always be victims, today is the day you are held accountable for these actions," defense counsel objected: "He is not on trial for the allegations out of the 1990s. He's repeatedly referred to 'them' as the victim, and accountable for 'these actions' including those of the 1990s. That's entirely inappropriate." *Id.* at 492. The district court agreed: "There's only one victim in this case. Objection sustained." *Id.*

In addition, during deliberations the jury had the benefit of two instructions emphasizing the point. Instruction No. 13 said:

> Evidence has been received that the defendant, JOHNNY KASH BRYANT SR has allegedly committed misconduct other than that charged in the information. You may not consider this evidence as proof of the guilt or innocence of JOHNNY KASH BRYANT SR of the specific offense charged in the information. This evidence has been received solely on the issue of his alleged intent, motive, plan and identity. This evidence is to be considered by you only for the limited purpose for which it was received.

17

R., Vol. I at 731. And Instruction No. 14 further alerted the jury that it should not

convict Mr. Bryant solely for past misconduct or a perceived propensity to molest

children:

> You have heard evidence that the defendant may have committed other
> offenses of child molestation in addition to the offense(s) for which he is
> now on trial. You may consider this evidence for its bearing on any matter
> to which it is relevant along with all of the other evidence and give this
> evidence the weight, if any, you deem appropriate in reaching your verdict.
> You may not, however, convict the defendant solely because you believe he
> committed these other offenses or solely because you believe he has a
> tendency to engage in acts of child molestation. The prosecution's burden
> of proof to establish the defendant's guilt beyond a reasonable doubt
> remains as to each and every element of the offense charged.

*Id*. at 732.

In denying Mr. Bryant's first application for postconviction relief, the OCCA

rejected his argument that his appellate attorney was constitutionally inadequate for

failure to challenge the prosecutor's improper remarks. The court said that he had not

shown that his counsel's performance was deficient or that he was prejudiced by

failure to raise prosecutorial misconduct. As we have explained above, this amounted

to a holding that the claim for relief based on the prosecutor's comments lacked

merit, and this holding is entitled to AEDPA deference under 28 U.S.C. § 2254(d).

*See Goode*, 922 F.3d at 1159–60. Given the trial court's repeated and forceful

admonitions to the jury that the child was the only victim that Mr. Bryant was

charged with molesting, the OCCA did not unreasonably apply Supreme Court

precedent in holding that this prosecutorial-misconduct claim lacked merit. We

therefore must deny Mr. Bryant relief on this claim.

18

### C.     Requests for COA on other claims

Mr. Bryant appears to request a COA on four claims of ineffective assistance of appellate counsel on which the district court did not grant him a COA: (1) failing to argue actual innocence; (2) failing to challenge the trial attorney's advice to Mr. Bryant to waive his right to a preliminary hearing; (3) failing to challenge the admission of other-acts evidence relating to Ms. Yeoman; and (4) failing to challenge the failure of trial counsel to obtain the allegedly exculpatory October 1998 DHS report. We deny a COA on any of these four claims.

A COA will issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires the applicant to show that the district court's resolution of the claim was "debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "AEDPA's deferential treatment of state court decisions must be incorporated into our consideration of a habeas petitioner's request for COA." *Dockins v. Hines*, 374 F.3d 935, 938 (10th Cir. 2004).

The first claim on which Mr. Bryant seeks a COA concerns appellate counsel's failure to raise a claim of actual innocence on direct appeal. In this court his sole argument on the merits of the claim is that inconsistent timeline evidence showed his actual innocence. To establish actual innocence, the petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

19

And "the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id*. at 327; *see also Braun v. State*, 937 P.2d 505, 514 n.15 (Okla. Crim. App. 1997) (citing federal law to reject petitioner's actual-innocence contention). Mr. Bryant's rehashing of evidence from trial clearly cannot meet the actual-innocence standard.

The second claim is that appellate counsel failed to challenge trial counsel's advice that Mr. Bryant waive his right to a preliminary hearing. In support, he cites solely the exchange at the end of M.B.'s forensic interview as evidence that M.B.'s mother and grandmother coerced her into making false allegations. He argues that had this evidence, which had been reviewed by his attorney, been presented in a preliminary hearing, it would have defeated probable cause and forestalled prosecution; he further argues that a preliminary hearing would have provided testimony that could have been used for impeachment at trial. The OCCA resolved this claim on the merits, holding that Mr. Bryant had established neither deficient performance nor prejudice. The OCCA's decision is entitled to AEDPA deference. A competent attorney could reasonably have decided that a preliminary hearing was unlikely to produce a favorable result and would not provide helpful discovery or material for impeachment of witnesses at trial; and such a hearing would present the risk that it would preserve for trial the testimony of a witness who might later not wish to implicate Mr. Bryant (recall that Ms. Yeoman apparently had regretted implicating him on a prior occasion). As the Supreme Court has stated, "[S]trategic choices made after thorough investigation of law and facts relevant to plausible

20

options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. Here, Mr. Bryant admits, indeed he insists, that his attorney had all the information necessary to know whether a preliminary hearing would be helpful. The OCCA could reasonably conclude that Mr. Bryant did not satisfy his burden to show ineffective assistance under *Strickland*.

Mr. Bryant's third claim is that appellate counsel failed to challenge the admission of other-acts evidence—that is, much of Ms. Yeoman's testimony.[4] But appellate counsel *did* raise that challenge, and the OCCA rejected it, writing:

> Evidence of Bryant's prior acts of child molestation was properly admitted to establish his propensity to commit the sexual assault against M.B. and to rebut his claim that the allegations against him were fabricated. 12 O.S. 2011, § 2414(A).[5] The age of the other crimes evidence was one factor among many the trial court could consider in weighing the probative value against the prejudicial effect of this evidence. The many similarities between the prior crimes and the charged offense show a visible connection and make the probative value of the prior acts substantially outweigh any risk of unfair prejudice. [The claim] is denied.

---

[4] In his brief in this court, Mr. Bryant supplements this evidentiary claim with allegations of error in two jury instructions on the proper use of general other-acts evidence (the admonition given before Ms. Yeoman's testimony and Instruction No. 13, both quoted earlier in this opinion). He contends that they should have stated that other-acts evidence can be used against a defendant for only one of the enumerated purposes (say, motive but not identity). To the extent this jury-instruction argument is relevant to the evidentiary issue, it is not preserved for our review because his amended § 2254 application below did not so much as mention the jury instructions under this claim. In any event, the claim is frivolous.

[5] Under Oklahoma law, "[i]n a criminal case in which the defendant is accused of an offense of child molestation, evidence of the defendant's commission of another offense or offenses of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant." Okla. Stat. tit. 12 § 2414(A).

R., Vol. II at 222–23. Because appellate counsel made precisely the argument Mr. Bryant says was wrongly omitted, the claim is baseless and must be rejected.

Mr. Bryant's fourth and final claim alleges that appellate counsel should have argued that trial counsel was ineffective for not obtaining and using the October 1998 DHS report. The OCCA reached and rejected a claim concerning the DHS report, but the substance of how Mr. Bryant says the report should have been used has appreciably changed between then and now. In state court Mr. Bryant merely argued that the report could have been used to better cross-examine Ms. Yeoman. In his amended § 2254 application he claimed that the report could have been used to better cross-examine Ms. Yeoman *and* prevent admission of her testimony in the first place. In this court he solely argues that the report could have been used to prevent admission of Ms. Yeoman's testimony because other-acts evidence is admissible in Oklahoma only if established by clear and convincing evidence. *See Horn v. State*, 204 P.3d 777, 786 & n.3 (Okla. Crim. App. 2009). But that version of the claim is unexhausted and would now be procedurally barred if raised in state court. *See* Okla. Stat. tit. 22 § 1086 (grounds for relief that could have been, but were not, brought in the first application for postconviction relief are procedurally barred in a subsequent application). Mr. Bryant does not argue any excuse for the default. He therefore is barred from relief on this claim. *See Grant*, 886 F.3d at 901–02 (were applicant to return to state court to present unexhausted claim, state court would find claim procedurally barred, so "anticipatory procedural bar" precluded federal court's consideration of claim).

No reasonable jurist could debate the district court's resolution of the claims for which Mr. Bryant seeks a COA.

### III.    CONCLUSION

We **GRANT** Mr. Bryant's motion to proceed *in forma pauperis*. We **AFFIRM** the district court's denial of relief under 28 U.S.C. § 2254.

Entered for the Court


Harris L Hartz
Circuit Judge